# 11-2231-cv

## *United States Court of Appeals*
## *for the*
## *Second Circuit*

JAMES M. MALONEY,

Plaintiff-Appellant,

-against-

THE COUNTY OF NASSAU, ROBERT SEIDEN, DENIS DILLON, IN HIS OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NASSAU, JOAN P.
YALE, JOHN DOES, #1 -100,

Defendants-Appellees,

THE POLICE DEPARTMENT OF THE COUNTY OF NASSAU, JOHN A. JOHNSON, IN
HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE STATE OF NEW YORK
OFFICE OF THE CHILDREN AND FAMIY SERVICES, DAVID R. PETERS, IN HIS
OFFICIAL CAPACITY AS DIRECTOR OF THE STATE CENTRAL REGISTER OF THE
STATE OF THE NEW YORK OFFICE OF CHILDREN AND FAMILY SERVICES,

Defendants.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

# BRIEF FOR PLAINTIFF–APPELLANT

James M. Maloney, Esq.
LAW OFFICE OF JAMES M. MALONEY
*Plaintiff-Appellant*
33 Bayview Avenue
Port Washington, NY 11050
(516) 767-1395

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT PER LOCAL RULE 28(2) . . . . . . . . . . . . . . . . 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

POINT I

     THE COURT BELOW ERRED BY HOLDING THAT DEFENDANT
     YALE'S "MISTAKEN BELIEF" TO THE EFFECT THAT USING
     EXPLOSIVES TO GAIN ENTRY TO PLAINTIFF'S SAFE
     WITHOUT A WARRANT WAS "REASONABLE" SUCH AS TO
     CONFER UPON HER QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . 13

POINT II

     THE COURT BELOW ERRED BY HOLDING THAT DEFENDANT
     YALE ALSO HAD QUALIFIED IMMUNITY WHERE PLAINTIFF
     HAD RESISTED THE REPEATED ORDERS THAT HE LEAVE
     HIS HOME AND DEMANDED THAT POLICE PRODUCE A
     WARRANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

POINT III

     THE COURT BELOW ERRED BY HOLDING THAT THERE
     WAS NO BASIS IN THE RECORD OR AT LAW TO FIND THAT
     "THE DECISION TO RETAIN [PLAINTIFF'S] PROPERTY
     AFTER THE PROSECUTION PHASE OF PLAINTIFF'S CASE

WOULD VIOLATE PLAINTIFF'S CLEARLY ESTABLISHED
RIGHTS [AND THAT DEFENDANT DISTRICT ATTORNEY]
DILLON IS PROTECTED BY QUALIFIED IMMUNITY". . . . . . . . . 17

POINT IV

THE COURT BELOW ERRED BY GRANTING SUMMARY
JUDGMENT IN FAVOR OF DEFENDANT SEIDEN, A PRIVATE
ACTOR WHO ACTED JOINTLY WITH OFFICIALS UNDER
COLOR OF STATE LAW, AS TO THE FEDERAL CLAIMS
ASSERTED AGAINST SEIDEN ON THE BASIS THAT THE
OFFICIALS HAD QUALIFIED IMMUNITY, AND BY
DISMISSING THE RELATED SUPPLEMENTAL STATE-LAW
CLAIMS AGAINST SEIDEN BECAUSE THERE WAS NO
LONGER A FEDERAL CLAIM REMAINING . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

*Brown v. City of Syracuse*, 623 F. Supp. 2d 272 (N.D.N.Y. 2009) . . . . . . . . . . . 3

*Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319 (E.D.N.Y. 2009) . . . . . . . . 3

*Hubbard v. Total Communications, Inc.*, 623 F. Supp. 2d 270 (D. Conn. 2009) . . 3

*Maloney v. County of Nassau*, 623 F. Supp. 2d 277 (E.D.N.Y. 2007) . . . . . *passim*

*Moore v. Andreno,* 505 F.3d 203 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Morris v. Jackson*, 353 F. Supp. 2d 1199 (M.D. Ala. 2005) . . . . . . . . . . . . . . . . 18

*New York v. Gutierrez*, 623 F. Supp. 2d 301 (E.D.N.Y. 2009) . . . . . . . . . . . . . . 3

*Nieves v. New York City Police Dept.*
2010 WL 2010879 (S.D.N.Y. May 18, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Payton v. New York*, 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . 7, 12, 15-17

*Sharrar v. Felsing*, 128 F.3d 810 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) . . . . . . . . . . . . . 20-21

*United States v. Davis*, 967 F.2d 84 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Gori*, 230 F.3d 44 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . 16-17

*United States v. Gradowski*, 502 F.2d 563 (2d Cir.1974) . . . . . . . . . . . . . . . . . 14

*United States v. McGee*, 564 F.3d 136 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . 14

*United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984) . . . . . . . . . . . . . . . . . 17

*Wyatt v. Cole*, 504 U.S. 158 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

-iii-

## JURISDICTIONAL STATEMENT

A. The court below had subject matter jurisdiction over the federal causes of action stated in the complaint,[1] consisting primarily of causes of action arising under the Constitution of the United States for which redress was sought pursuant to the provisions of 42 U.S.C. § 1983, over which the District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and the District Court had supplemental jurisdiction over the state-law claims.

B. This Court has jurisdiction over this appeal from a final order of the District Court pursuant to the provisions of 28 U.S.C. § 1291.

C. The District Court's Orders and Judgments from which appeal is taken are as follows: (1) a non-final Memorandum and Order dated September 24, 2007 (entered September 25, 2007) (Document 99) (hereinafter, the "2007 Opinion"), in which the court below dismissed the third cause of action, as against the state officials, and also dismissed all claims against the County of Nassau and the Police Department of the County of Nassau; (2) a non-final Memorandum and Order dated and entered March 31, 2009 (Document 136), in which the court below denied Plaintiff's motions for reconsideration and/or for Rule 54 entry of final judgment as

---

[1] All references to the "complaint" herein are to the First Amended Complaint, which is the operative pleading, and which may be found in the Joint Appendix beginning at page A-18. The pleading is listed on the District Court docket sheet as entry 3 ("Document 3") . NOTE: "Document" numerical references hereinafter refer to District Court docket sheet entries. They and A-[page] references will be placed in boldface and brackets when within quoted passages in this brief to indicate that material has been added within the quotation.

-1-

against the state officials; (3) a Memorandum and Order dated September 30, 2010 (entered October 5, 2010) (Document 160) (hereinafter, the "2010 Opinion"), in which the court below dismissed all remaining claims as against all defendants on the putative basis of qualified immunity; (4) a corresponding Judgment dated September 30, 2010 (entered October 5, 2010) (Document 161); (5) a related Judgment dated and entered October 6, 2010 (Document 162) and (6) a final Memorandum and Order dated April 28, 2011 (entered May 3, 2011) (Document 167), in which the court below denied Plaintiff's motion for reconsideration of the September 30, 2010, Memorandum and Order (although that final Memorandum and Order did not actually address Plaintiff's motion for reconsideration as to Defendant Seiden).

D. This appeal is taken from the final Memorandum and Order dated April 28, 2011 (entered May 3, 2011) (Document 167), which adhered to the 2010 Opinion, and from all other decisions and orders of the court below, including but not limited to the 2007 and 2010 Opinions as hereinbefore defined.

## PRELIMINARY STATEMENT PER LOCAL RULE 28(2)

All Memoranda and Orders listed in Part C of the jurisdictional statement above were rendered by the Honorable Sandra L. Townes.  The 2007 Opinion was initially unreported, but was later published in the Federal Supplement among more recent cases, and appears at 623 F. Supp. 2d 277, 299 (E.D.N.Y. 2007) (NOTE: The cases before and after the reported opinion in *Maloney v. County of Nassau* are

-2-

all from mid-2009; see, e.g., two cases in both directions in Volume 623 of the

Federal Supplement, as follows: *Hubbard v. Total Communications, Inc.*, 623 F.

Supp. 2d 270 (D. Conn., June 10, 2009); *Brown v. City of Syracuse*, 623 F. Supp.

2d 272 (N.D.N.Y., June 10, 2009); *Maloney v. County of Nassau*, 623 F. Supp. 2d

277 (E.D.N.Y., September 25, 2007); *New York v. Gutierrez*, 623 F. Supp. 2d 301

(E.D.N.Y., March 9, 2009); *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319

(E.D.N.Y., March 31, 2009).)


## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the court below erred by holding that Defendant Yale's "mistaken

belief" to the effect that using explosives to gain entry to plaintiff's safe without a

warrant could was "reasonable" such as to confer upon her qualified immunity.  The

standard of review is *de novo*.

2.    Whether the court below erred by: (a) holding that Defendant Yale also had

qualified immunity where plaintiff had resisted the repeated orders that he leave his

home and demanded that police produce a warrant--for twelve hours--before he

finally left his home and surrendered, thereby (b) rejecting the proposition that any

reasonable official would understand that what he or she is doing violates the law

under such circumstances, when a warrant is actually being demanded by the

occupant of the home for a lengthy and protracted period during which police refrain

from actually entering the home.  The standard of review is *de novo*.

3.    Whether the court below erred by holding that there was no basis in the record or at law to find that "the decision to retain [plaintiff's] property after the prosecution phase of plaintiff's case would violate plaintiff's clearly established rights [and that Defendant District Attorney] Dillon is protected by qualified immunity."  The standard of review is *de novo*.

4.    Whether the court below erred by granting summary judgment favor of Defendant Seiden, a private actor who acted jointly with officials under color of state law, as to the federal claims asserted against Seiden on the basis that the officials had qualified immunity, and by dismissing the related supplemental state-law claims against Seiden because there was no longer a federal claim remaining. The standard of review is *de novo*.

<u>STATEMENT OF THE CASE</u>

This was a civil-rights action brought in 2003 against various state and county actors and against one private actor (Robert Seiden, Esq.), who has admitted to having worked in full joint effort with the police during the incident in 2000 out of which all these claims arose, in which armed Nassau County police surrounded Plaintiff's home without an arrest or search warrant for 12 hours and cut off all his telephone lines during that time.  Throughout the ordeal, Plaintiff demanded that police obtain a warrant, and asked to be permitted to speak to an attorney.  The police, acting through a person pretending to be Plaintiff's attorney (Defendant Seiden) with whom Plaintiff was allowed to communicate by telephone, warned

-4-

Plaintiff that if he did not come out of his home the police would enter forcibly, which would possibly result in injury or death to Plaintiff's family.  After Plaintiff complied, police entered Plaintiff's home in large numbers without a warrant, seized Plaintiff's personal property (some of which was subsequently wrongfully withheld for years and some of which was subsequently destroyed), and used explosives to destructively access the contents of Plaintiff's private safe, to which only he had the combination, seizing most of the items therein.  The original, uncorroborated allegation that had been the putative basis for the huge police response, which had resulted from Plaintiff's observation of a telephone worker with a telescope from within his home, was subsequently dismissed separate and apart from any plea agreement, and Plaintiff has never been convicted of any crime.

## STATEMENT OF FACTS

The following facts are taken largely from, and are set forth in greater detail in, Document 158, the Declaration of Plaintiff-Appellant executed March 12, 2010 (A-113 to A-146) (and are supported by the exhibits thereto that are incorporated within that document, *q.v.* at A-124 to A-146, referenced herein).  Numerous other parts of the record, including pleadings and deposition transcripts introduced via motion practice, set forth and corroborate facts as alleged here and elsewhere and will be referenced sparingly as needed.  Substantial development of facts occurred despite the lengthy initial delay in commencing discovery on order of the court

-5-

below while the first substantive motions remained *sub judice* until the 2007 Opinion.

On August 23, 2000, at about 2:00 p.m., Plaintiff-Appellant was within his residence-based law office and observed, from an upstairs window, an unidentified man standing on a telephone line service platform that is located on a pole on the front curtilage of Plaintiff-Appellant's home. During March, April, and May of 2000, Plaintiff-Appellant had experienced numerous problem with his separate law office telephone line (516-767-1395). Shortly after seeing the man in the location described above, Plaintiff-Appellant had a conversation with him from within his home, through the open upstairs window, wherein the man stated that he was a telephone worker, but refused to identify himself any further, giving his first name only. In order to get a better idea of who the individual was in case there were subsequent telephone line problems, Plaintiff-Appellant used a small low-power telescope mounted on a cane for use in birdwatching to observe the telephone worker, training it upon him for one minute or less and then putting it away as soon as the individual had noticed that he was being observed. When the individual noticed that he was being observed he became angry, demanding to know what it was that Plaintiff-Appellant had pointed at him. Plaintiff-Appellant assured him that it was nothing harmful and said, "Don't worry about it." Thereafter, the individual remained on the platform for another 5-7 minutes, calmly finished his work, closed and latched the feeder box, and then climbed down the pole. Plaintiff-Appellant

-6-

remained in his home the entire time and had no further dialog with the individual.

At about 2:30 p.m. or shortly thereafter on the same day, an unmarked van arrived outside Plaintiff-Appellant's home, occupied by men in plain clothes who stated that they were police officers and that a telephone worker had complained that Plaintiff-Appellant had threatened him with a rifle.  Speaking to the men in plain clothes from the upstairs window, Plaintiff-Appellant denied that he had done any such thing, and attempted to explain what had happened.  One of the men interrupted and demanded that Plaintiff-Appellant come outside to talk to them, upon which Plaintiff-Appellant asked the speaker whether he was a state or federal officer, to which he replied, "Both," and again demanded that Plaintiff-Appellant come outside to talk to them.

Believing at the time that the speaker may be other than a police officer, and also well aware of his rights under *Payton v. New York*, Plaintiff-Appellant refused to leave his home.  Over the ensuing approximately 11-12 hours, Plaintiff-Appellant's home was surrounded by teams of armed police, all of his communication with the outside world (including his home telephone line, aforementioned office telephone line, and fax line) were cut off by the police, and Plaintiff-Appellant was allowed to speak by telephone only to Nassau County police and to an attorney, Defendant Robert Seiden, Esq., who purported to be acting on Plaintiff-Appellant's behalf but was, as Plaintiff-Appellant learned subsequent to the events described herein, a willful participant in joint action with the police the entire

-7-

time.

Over the nearly twelve hours during which they surrounded his home, Nassau County police repeatedly demanded that Plaintiff-Appellant leave his home and surrender into their custody, during which time Plaintiff-Appellant repeatedly denied that he had done anything wrong and repeatedly requested that police obtain a warrant if they wanted Plaintiff-Appellant in their custody or wished to enter the home. Plaintiff-Appellant eventually left only because Seiden convinced him to do so.

Plaintiff-Appellant subsequently learned that while he was out of his home and in police custody, Nassau County police entered my home in large numbers, searched it from basement to attic without a warrant, and used explosives to blow apart a safe that Plaintiff-Appellant had owned since the 1980s, and which Plaintiff-Appellant had mounted by bolts and epoxy inside an old refrigerator at right angles for increased protection of the contents from theft and fire (the door to the safe being mounted at right angles to the outer refrigerator door preventing a drill from being used to drill the front of the safe, and the refrigerator's insulation providing protection of the contents of the safe from fire and heat).

The combination to this now-destroyed but carefully fortified and uniquely valuable safe was known only to Plaintiff-Appellant, and not to any other person. Specifically, Plaintiff-Appellant's wife did not know the combination to the safe.

Once police, under Defendant Yale's direct control, destroyed the safe to

access its contents, they seized from it three handguns (revolvers) that had been

legally purchased by Plaintiff-Appellant decades before in Florida and New Jersey

but not "registered" in New York when Plaintiff-Appellant brought them into his

Port Washington, New York, home in 1996.  None of the revolvers were loaded, no

ammunition was present in the safe, and two of the revolvers had been rendered

inoperable by Plaintiff-Appellant.   These weapons-possession charges, none of

which related to the telephone worker's allegation in any way, became the basis of a

serious and extended prosecutorial effort that lasted for nearly three years.  Finally,

in early 2003, all of the then-remaining criminal charges against Plaintiff-Appellant

were dismissed in exchange for his plea to disorderly conduct (a violation) in

connection with his "possession" of a .38-caliber Smith & Wesson revolver

(purchased legally by Plaintiff-Appellant in Florida in 1984, and the only one of the

three that was not readily capable of being rendered inoperable when Plaintiff-

Appellant moved into his New York home) in the locked safe that police destroyed

in order to seize.

Promptly thereafter, Plaintiff-Appellant began seeking the return of all seized

property that was not subject to forfeiture pursuant to the plea agreement.

On or about July 23, 2003, in that connection, Plaintiff-Appellant wrote to the

last of the three Assistant District Attorneys who had been in charge of the

prosecution over the nearly three years prior, that being Robert Formichelli, Esq.

(See Exhibit 3, A-135.) Receiving no response to the foregoing for more than three

months, on or about September 29, 2003, Plaintiff-Appellant wrote directly to District Attorney Denis Dillon, who was named, with his successor(s), as a Defendant in this lawsuit. (See Exhibit 4, A-137.)

On or about October 2, 2003, Plaintiff-Appellant received a telephone call from a Ms. Camille Russell of the District Attorney's office. Ms. Russell stated that she was responding, at Mr. Dillon's request, to the follow-up letter Plaintiff-Appellant had sent. She stated that the property other than weapons and ammunition was in the custody of the Port Washington Police Department and gave Plaintiff-Appellant the name of a contact person there. She also stated that the District Attorney had certain policies regarding the return of firearms and ammunition that had been seized in connection with criminal prosecutions, and she stated that in order to begin the process Plaintiff-Appellant would need to provide her a copy of the transcript of the proceedings that disposed of the criminal matter, which Plaintiff-Appellant promptly did. (See Exhibit 5, A-139.)

As reflected in the record below, the valuable long guns seized by the police who destructively opened the safe under Yale's direction were not returned to Plaintiff-Appellant until August 2005, following the Nassau County Police Department's having taken the position that a court order would be needed before the weapons would be returned. See docket entries 52, 54 (and July 28, 2005, order re: same), 55, and 58.

Although the weapons themselves were not seriously damaged, the sighting

equipment on some had been destroyed.  (See Exhibit 6, A-141 to A-142.)

In the process of retrieving his long guns, Plaintiff-Appellant communicated by telephone and in person with Mr. Israel Santiago, who is both a licensed attorney and a Nassau County Police officer.  Mr. Santiago informed Paintiff-Appellant that there was a policy of destroying ammunition "for safety reasons," although he never stated explicitly whether the ammunition that had been seized from Plaintiff-Appellant home had actually been destroyed.  When Plaintiff-Appellant asked him whether the "policy" of destroying ammunition "for safety reasons" was that of the Nassau County Police Department or of the Nassau County District Attorney, he stated that he was not sure.  In any event, although Plaintiff-Appellant made repeated written demands to Mr. Santiago that the approximately 30 boxes of ammunition that was seized be located and returned (or if it was destroyed, that documentation of same be provided), Plaintiff-Appellant received neither a response nor any of the ammunition.  (See Exhibit 7, A-144 to A-146.)

As noted, during the approximately twelve hours prior to Plaintiff-Appellant's surrender to police without a warrant on August 24, 2000, police surrounded Plaintiff-Appellant's home and cut of all his communication with the outside world except that which they would permit.  Teams of armed men, carrying M-16s, were visible to Plaintiff-Appellant standing ready at the window of a nearby apartment building.  At no time throughout the ordeal did Plaintiff-Appellant display a weapon or threaten to harm anyone, and nothing in the record indicates otherwise.

-11-

(Common sense indicates that if such had occurred, Plaintiff-Appellant would have been charged criminally for such conduct, which he was not.)  Defendant Yale admitted at her deposition both that she was the highest ranking official at the scene and that police never even sought a warrant during those twelve hours, although Plaintiff-Appellant repeatedly demanded that they produce one.  It was only because of Defendant Seiden's "advice" that Plaintiff-Appellant eventually abandoned his long-repeated demand for a warrant.  This, coupled with the prolonged duration of a tense situation in which Plaintiff-Appellant was rendered powerless and made to believe that his family would be harmed if he persisted in asserting his *Payton* rights, was what led Plaintiff-Appellant eventually to give up and leave his home.[2] To call such a decision wholly "voluntary," as certain Defendants have done in this litigation, is inaccurate, self-serving, and disingenuous.

---

[2] Paradoxically, at the 2008 administrative hearing that finally adjudicated Plaintiff-Appellant's lengthy listing on the Child Abuse & Maltreatment Register, https://files.nyu.edu/jmm257/public/letter-re-fair-hearing-result-w-decision-redacted.pdf, counsel for Nassau County argued strenuously (albeit unsuccessfully) that Plaintiff-Appellant's assertion of his constitutional right to remain in his home unless and until a warrant was obtained during the 12-hour ordeal was evidence that he was an unfit parent who had placed his children at risk and should therefore remain indefinitely on the Child Abuse & Maltreatment Register.  (The Nassau County Attorney's Office also made the fact of the listing public in 2007, nearly a full year before the 2008 administrative hearing occurred, in a brief before this Court.  *Id.*)

ARGUMENT

POINT I

THE COURT BELOW ERRED BY HOLDING THAT DEFENDANT
YALE'S "MISTAKEN BELIEF" TO THE EFFECT THAT USING
EXPLOSIVES TO GAIN ENTRY TO PLAINTIFF'S SAFE
WITHOUT A WARRANT WAS "REASONABLE" SUCH
AS TO CONFER UPON HER QUALIFIED IMMUNITY

At pages 13-14 of the 2010 Opinion (A-98 to A-99), the court below wrote:

> In *Moore v. Andreno* [505 F.3d 203, 211 (2d Cir.2007)], police entered and searched plaintiff's residence which he shared with his girlfriend after his girlfriend had broken into a locked study to which she did not have keys. The court found that the girlfriend lacked actual authority to consent to the search of the study and entry was not justified by exigent circumstances, but because the law governing third party consent searches was unsettled, the deputies were qualifiedly immune. *Moore*[,] 505 F.3d at 215.

> As in *Moore*, it is not clear at the time of the search whether Comer's belief that there was a possibility that her jewelry was in the safe satisfied the access requirement under *Davis*. Based on an ambiguity in the law, an officer could have reasonably believed that Comer's belief that her jewelry could be in the safe was sufficient to constitute a substantial interest that could validate her consent. *See Moore* at 215 (finding law governing substantial interest under *U.S. v. Davis* to be unsettled). "If the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205. Thus, defendant Yale is protected by qualified immunity, and the County Defendants' motion is granted on this point.

Here, in sharp contrast to the facts in *Moore*, the third party whose consent

was sought (here, Plaintiff's wife, who gave it only under extreme coercion, an issue

-13-

that need not be reached) lacked actual access to the area to be searched, and therefore lacked any apparent authority to consent to the search.  In *Moore*, the consent was sought "after [plaintiff's] girlfriend had broken into a locked study to which she did not have keys" (*see supra*), which is quite different from the police themselves breaking into the area to be searched, which is what occurred here.

The court below has mistakenly interpreted this Court's standards under *United States v. Davis*, 967 F.2d 84 (2d Cir. 1992), and its progeny, as applicable here.  As this Court wrote in 2009:

> In *Davis*, restating what we had earlier noted in *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir.1974), we said that such a person (described as a "third party") validates a search by giving the authorities consent to search "if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access."  *Davis*, 967 F.2d at 87.

*United States v. McGee*, 564 F.3d 136, 139-140 (2d Cir. 2009) (emphasis added).  While the third party in *Moore* had "access to the area searched" (cloaking her with apparent authority), Plaintiff's wife here had no such access; rather, the police used explosives to gain access to Plaintiff's safe even though she was present because she did not have the combination (and therefore, axiomatically, did not have access).  Thus, *Moore* is readily distinguishable because of the presence of the first prong (access).

To hold that a person may legitimately consent to a search of the inside of a

safe to which that person lacks access, such that police must use explosives to open the safe, would be a significant erosion of the Fourth Amendment.

POINT II

At page 16 of the 2010 Opinion (A-101), the court below wrote:

> Because neither the Supreme Court nor the Second Circuit has recognized a *Payton* [*v. New York*, 445 U.S. 573 (1980)] violation in the absence of a warrantless physical intrusion into the home, the law in this area is not clearly established in this Court. The Court's qualified immunity jurisprudence denies immunity only where it is sufficiently clear that a reasonable official would understand that what he is doing violates the law. *See Kerman v. City of New York*, 261 F.3d 229, 237 (2001). Therefore, defendant Yale is entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claims.

In support of the above, the court below analogized the facts of *Nieves v. New York City Police Dept.*, 2010 WL 2010879 (S.D.N.Y. May 18, 2010), in which "officers arrested the plaintiff after they ordered him out of his apartment with guns drawn." In sharp contrast to the facts in *Nieves*, however, Plaintiff here resisted the repeated orders that he leave his home and demanded that police produce a warrant--for nearly twelve hours--before he finally left his home and surrendered. Any reasonable official would understand that what he or she is doing violates the law under such circumstances, when a warrant is actually being demanded by the occupant of the home for a lengthy and protracted period

-15-

during which police refrain from actually entering the home.[3]  Moreover, as alleged in the Amended Complaint at ¶ 40 (A-22), Defendant Seiden (who, by his own admission, was acting pursuant to police order, even though he pretended to be acting as Plaintiff's attorney) "repeatedly advised Plaintiff that the police were preparing to break down the door and 'storm' the house 'any minute' and that Plaintiff's wife and infant sons may be hurt if this were to occur[,]' and Plaintiff left his home because "[t]he continued threat of such harm to Plaintiff's family was too great for Plaintiff to bear."  Since those allegations must be taken as true for purposes of a summary judgment motion, it is respectfully submitted that the court below erred by finding that Yale, the person in charge of the police who ordered Seiden to convey such threats to Plaintiff, "would [not] understand that what [she] was doing violate[d] the law" and thereby affording her qualified immunity.

The court below also cited *United States v. Gori*, 230 F.3d 44 (2d Cir. 2000), on this point.  It is worth noting that in that case, the majority of the Panel expressly refrained from addressing facts comparable to those present here:

Given the narrow question raised by the distinctive facts in

---

[3] The very fact that police did not forcibly enter the home for so long reinforces the argument that they were aware that they had no right to do so. Accordingly, given that Plaintiff demanded for twelve hours that they obtain a warrant, they must also have been aware that coercing him to leave his home in the absence of a warrant violated his rights.

-16-

this case, we do not consider the questions presented when police surround a dwelling, flood it with searchlights, and order evacuation over a bullhorn. *See, e.g., [United States v.] Morgan*, 743 F.2d [1158 (6th Cir. 1984)] at 1164-67 (finding a *Payton* violation on similar facts); *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir.1997) (finding *Payton* violation where "SWAT team surrounds a residence with machine guns pointed at the windows and then persons inside are ordered to leave the house backwards with their hands raised").

230 F.3d at 52 n.2.

And as the dissent in *Gori* noted:

The occupants of Apartment 1M did not voluntarily choose to exit the apartment; they were ordered to do so by officers with drawn guns. With their show of authority from outside the door, the officers achieved the same result--forcing the occupants into the hallway--as they would have achieved had they crossed into the apartment and removed the occupants.

*Id*. at 62 (Sotomayor, J., dissenting).

Given all of the foregoing, it is respectfully submitted that it is reversible error for the court below to have granted summary judgment on the issue of Yale's qualified immunity on this important constitutional claim.

POINT III

THE COURT BELOW ERRED BY HOLDING THAT THERE WAS NO BASIS IN THE RECORD OR AT LAW TO FIND THAT "THE DECISION TO RETAIN [PLAINTIFF'S] PROPERTY AFTER THE PROSECUTION PHASE OF PLAINTIFF'S CASE WOULD VIOLATE PLAINTIFF'S CLEARLY ESTABLISHED RIGHTS [AND THAT DEFENDANT DISTRICT ATTORNEY] DILLON IS PROTECTED BY QUALIFIED IMMUNITY"

-17-

At page 9 of the 2010 Opinion (A-94), the court below wrote:

This Court, like the court in *Morris* [*v. Jackson*, 353 F. Supp. 2d 1199 (M.D. Ala. 2005)], cannot identify any cases sufficient to show that a prosecutor's decision to retain property after the prosecution phase of plaintiff's case would violate plaintiff's clearly established rights. Therefore, Dillon is protected by qualified immunity and summary judgment on this issue is granted.

Plaintiff's "clearly established right" as against District Attorney Dillon, however, need not be established by general case law, because it was established by the actual terms of his plea agreement in connection with the disposition of the criminal charges against him in January 2003, before this action was even commenced, the transcript of which is part of the record before this Court.  See Document 36-4 at page 37 of 50 thereof (Exhibit I submitted by County in motion) (full exhibit at A-156 to 161, referenced page at A-158), wherein Plaintiff's defense attorney notes (lines 2-3): "We do submit to the destruction of all unlicensed handguns and there were other items we will be getting back. [emphasis added]" Although some of those "other items" (i.e., Plaintiff's property that had been seized, including several long guns) were eventually returned to Plaintiff, see Document 58 (letter from County Attorney dated August 12, 2005) (A-147), others (e.g., ammunition) were destroyed and never returned.  See Document 158 (Plaintiff-Appellant's declaration) at ¶¶ 25-26 and Exhibits 6-7 thereto (A-117 to A-118; A-140 to A-146).

Finally, it is unfortunately necessary to note that the court below appears to

-18-

have had its mind made up as the continuing status of the District Attorney as a party well before its written opinion on the matter in the 2010 Opinion, specifically as early as December 8, 2009, expressing such sentiments immediately before discussing a briefing schedule for the very motions that the 2010 Opinion would decide (and thus, obviously and disturbingly, before actual briefing was even received).  See A-149 to A-155 (Transcript of Civil Cause for Status Conference, December 8, 2009), at page 3, lines 11-12 (A-151) (court below suggesting by omission that the District Attorney was no longer a party); *id*. at page 3, lines 19-20 (Plaintiff, after waiting to see if the omission would be caught by his attorney, rising in the back of the room to state that there is still a cause of action as against the District Attorney, upon which the following dialog occurred:

MR. SERBY [Plaintiff-Appellant's attorney below]: Oh, yes, Your Honor. I think that's correct. The defendant Dillon is still a -- still a party to the case, although I think --

THE COURT: The District Attorney?

MR. SERBY: Yes, I think.

THE COURT: Well, if he is still a party to the case, he'll be gone.  All right. So, now, should we schedule a briefing schedule now for the summary judgment motion?

*Id*. at page 3, lines 24-25; page 4, lines 1-7 (A-151 to A-152).

POINT IV

THE COURT BELOW ERRED BY GRANTING SUMMARY JUDGMENT
IN FAVOR OF DEFENDANT SEIDEN, A PRIVATE ACTOR WHO ACTED
JOINTLY WITH OFFICIALS UNDER COLOR OF STATE LAW, AS TO THE
FEDERAL CLAIMS ASSERTED AGAINST SEIDEN ON THE BASIS THAT
THE OFFICIALS HAD QUALIFIED IMMUNITY, AND BY DISMISSING THE
RELATED SUPPLEMENTAL STATE-LAW CLAIMS AGAINST SEIDEN
BECAUSE THERE WAS NO LONGER A FEDERAL CLAIM REMAINING

The court below dismissed the federal causes of action against Seiden,
concluding as follows: "Because all substantive § 1983 claims against named state
actors have been dismissed, claims alleging Seiden's participation must also be
dismissed."    2010 Opinion at 18 (A-103).  However, the substantive § 1983 claims
against named state actors have not been dismissed; rather, those state actors have
been granted qualified immunity.  Even assuming that the court below were correct
in granting qualified immunity to the state actors (which Plaintiff respectfully
disputes, see Points I-III, *supra*), the action against Seiden must remain, for the
following reasons.

As the court below correctly stated, "a § 1983 conspiracy action against
private individuals will stand 'only insofar as the plaintiff can prove the sine qua non
of a § 1983 action: the violation of a federal right.'"  2010 Opinion at 17 (A-102)
(quoting *Singer v. Fulton County Sheriff*,[4] 63 F.3d 110, 119 (2d Cir. 1995)).

---

[4] In *Singer*, the Second Circuit affirmed the district court's dismissal of
conspiracy claims based on the district court's "conclusion that Singer could not
prove essential elements of his claims of false arrest and malicious prosecution,

However, nothing in a qualified immunity dismissal of the parties establishes that the federal right was not violated; rather, public policy allows dismissal of the state actors who violated the federal right under qualified immunity either because the federal right was not "clearly established" at the time of the violation or because the state actors had a good-faith belief that they were not engaging in such a violation. The question of whether a private actor is entitled to qualified immunity is a separate question that was not addressed by this Court, but was addressed by the United States Supreme Court in *Wyatt v. Cole*, 504 U.S. 158 (1992). There, the Court held that private actors are not entitled to qualified immunity. Under the reasoning of the court below, any dismissal of state actors on qualified immunity grounds would also "negate" the underlying violation of the federal right, resulting in dismissal of the private actor(s) as a result of qualified immunity having been granted to state actors, albeit for a different stated reason (i.e., that the qualified immunity grant somehow negates the underlying violation of the federal right). Were such reasoning to be adopted and applied as controlling law, the Supreme Court's holding in *Wyatt* would be rendered superfluous because private actors

---

and therefore could not prove an actual violation of his constitutional rights." 63 F.3d at 119. Here, there has been no finding that Plaintiff "could not prove an actual violation of his constitutional rights." Rather, the award of summary judgment in favor of Dillon and Yale is based on the Court's ruling that, even treating the allegations of the Amended Complaint as true (in which case Plaintiff's federal rights in were violated), the state actors are entitled to qualified immunity. Thus, *Singer* is inapposite for the proposition for which it is quoted.

would always be dismissed whenever the associated state actors were granted qualified immunity.

Further, as the Court explained in *Wyatt*, "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." 504 U.S. at 167 (emphasis added). It is thus an element or underlying assumption essential to a grant of qualified immunity that the injury (i.e., the violation of his constitutional rights) has occurred, and the decision of the court below to the effect that the qualified immunity grant somehow negates the underlying violation of the federal right (i.e., the injury) is directly contrary to the holding of *Wyatt* in that regard as well. Thus, even if Dillon and Yale are granted qualified immunity, the claims against Seiden remain viable.

CONCLUSION

For all of the foregoing reasons, the decisions of the court below should be REVERSED.

Dated:     January 4, 2012
           Port Washington, New York

                                        Respectfully submitted,

                                        James M. Maloney, Esq.
                                        Plaintiff-Appellant
                                        33 Bayview Avenue
                                        Port Washington, NY 11050
                                        (516) 767-1395

-22-

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☑    this brief contains   six thousand (6,000)   words, excluding the
parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains [*state the
number of*] lines of text, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of  Fed. R. App. P. 32(a)(5) and the
type style requirements of Fed. R. App. P. 32(a)(6) because:

☑    this brief has been prepared in a proportionally spaced typeface
using          Corel WordPerfect version 10.0.0.696          in
14-point Times New Roman          , *or*

☐    this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state
number of characters per inch and name of type style*].

(s)    _____

Attorney for **Plaintiff-Appellant**

Dated: **January 6, 2012**